LEBERT WHITE, Plaintiff-Appellee and Cross-Appellant, *v.* WHITE OWL EXPRESS, INC. *et al.,* Defendants-Appellants—(STRICK TRAILER COMPANY, Defendant and Cross-Appellee, and MID-AMERICAN TRUCK LINES, INC., Third-Party Defendant-Appellee.)

(No. 55415;

First District (5th Division)—January 31, 1974.

*Modified opinion upon denial of rehearing May 24, 1974.*

Howard & French, of Chicago (Richard G. French and Gary E. Dienstag, of counsel), for White Owl Express, Inc.

Tom L. Yates, of Chicago (Carl E. Abrahamson, of counsel), for Strick Trailer Company.

Hinshaw, Culbertson, Moelmann, Hoban & Fuller, of Chicago (Leonel I. Hatch, Jr. and D. Kendall Griffith, of counsel), for Mid-American Truck Lines, Inc.

Mr. JUSTICE LORENZ delivered the opinion of the court as modified upon denial of petition for rehearing:

The instant case arises out of the personal injuries plaintiff Lebert White received in shifting the bogey of a tandem trailer at the truck yards of third-party defendant Mid-American Truck Lines, Inc. The trailer was owned by defendant White Owl Express, Inc., driven by defendant Charles Baker, and manufactured by defendant Strick Trailer Co., Inc. Defendants White Owl and Baker brought Mid-American into the case on a third-party complaint. Defendant White Owl appeals from a directed verdict in favor of Mid-American, contending that Mid-American was required to indemnify White Owl and from a judgment on a verdict in favor of White, contending that White was contributorily negligent. Plaintiff White appeals from a directed verdict in favor of Strick, contending that he should have been permitted to proceed on his negligence and breach of warranty theories.

Plaintiff filed an amended four-count complaint for damages. Count I alleged that he was free of contributory negligence and that his injuries were a result of White Owl's and Baker's negligent maintenance and use of the trailer. Counts II, III and IV, against Strick, alleged negligence, breach of warranty, and strict liability respectively. Count II alleged that Strick had negligently designed and manufactured the trailer which caused the injury to plaintiff. Count III alleged that Strick breached its warranty that the trailer was fit for hauling freight safely. Count IV alleged that Strick sold a defective and therefore unreasonably dangerous trailer which was designed and manufactured in such a way either that the pins holding the bogey in place would stick or that a man would have to crawl underneath it. White Owl, Baker, and Strick answered denying liability.

Furthermore, White Owl and Baker filed a third party complaint against Mid-American for indemnification on the basis of a National Motor Equipment Interchange Agreement to which both White Owl and Mid-American were parties. Mid-American answered[1] denying White Owl's right to indemnification. Although the full Interchange Agreement was not exhibited, the pleadings quoted its relevant provisions.

At trial, Charles Baker testified that he was employed by White Owl as a truck driver, that he drove trailer 4011 to the Mid-American truck terminal in Chicago arriving around midnight on December 4, 1963, and that upon his arrival he went to Mid-American's office bringing the bill of lading and the five copies of the Interchange Agreement report form. Mid-American's dispatcher assigned plaintiff Lebert White, Mid-American's chief "spotter," to inspect the trailer. Before going to inspect the

---

[1] Mid-American also filed a counterclaim against Baker but it is not relevant to this appeal.

trailer White signed the Interchange Agreement report. White completed his inspection except for shifting the bogey. (Shifting the bogey has the effect of redistributing the weight bearing on the rear axle which is necessary because of varying weight restrictions among the states.) When White attempted to shift the bogey, he was unable to do so. Both Baker and White attempted for 5 or 10 minutes to work the crank handle which releases the pins holding the bogey in place. Finally, White asked Baker to "shake" the trailer. White got underneath the trailer in order to work the tripper bar and chank handle. In shaking a trailer, the driver of the truck locks the brakes on the bogey and moves the tractor backwards and forwards in order to jar the pins loose. After Baker began shaking the trailer, he felt the trailer box slide and heard White scream. He then held the trailer in place and called for help. When he left the tractor he observed that White's right arm was caught underneath the trailer. After the incident and after White was freed and taken to the hospital, he picked up the interchange report which was laying on the ground and returned it to White Owl.

Baker testified that if the trailer had been working properly it would have required only one person to shift the bogey. That person would (1) set the air brakes on the bogey, (2) get underneath the trailer, (3) push the stripper bar up with his left hand (unlocking the mechanism), (4) turn the crank handle 90 degrees with his right hand (retracting the pins holding the bogey in place), (5) set the selector (fixing the desired location of the bogey), (6) get out from underneath the trailer, and (7) push or pull the trailer box with a power unit to the desired location.

However, trailer 4011 was not operating properly. A chain had to be installed to hold the crank handle open and the selector did not work properly. Baker testified that he could not remember when the pins on trailer 4011 ever retracted properly. The pins sometimes had to be hammered to get them to release. When this technique was used, the ends of the pins sometimes ballooned out and had to be removed with acetylene torches. Photographic exhibits were identified and admitted into evidence. Such photographs appeared to indicate that the tripper bar was disconnected.

Robert Lucas, a spotter for White Owl, testified that in 1959 or early 1960 White Owl purchased two or three new Strick trailers, including number 4011. Although he was familiar with the instructions plate on such trailers and had received instructions on the use of such trailers from White Owl's mechanic, he did not remember seeing an instruction plate on trailer 4011. He testified that the Strick trailers did not operate properly almost from the beginning. The pins would jump back into the locking holes prematurely. As a result, a chain was attached to the frame to hold the crank handle, which had to be pushed up higher than the

instructions diagram indicated, in the up position so that the bogey could slide. Furthermore, the pins stuck in the locking holes. When this problem arose, various alternatives were available. The tripper bar could be pounded up and the pins could be pounded out with sledge hammers. This method sometimes caused the ends of the pins to balloon out. Also, the truck could be "shaken" with a power unit to jar the pins loose. Lucas testified that anyone would know of the trailer's unsafe condition by looking at it, but he never complained to anyone regarding its condition.

The evidentiary deposition of Noah Robinson, a spotter for Mid-American who helped free plaintiff after he had been injured, was read into the record. Robinson heard White scream and ran to help. White's right arm was caught between the trailer and the bogey. By tying a rope to the crank handle and by sliding the bogey forward, they were able to free White. Robinson testified that White Owl's trailers were in very poor condition. They appeared never to have been serviced. The pins on such trailers do stick. The first step in loosening the pins is to shake the trailer. Had Robinson known how to use the chain, he testified he would have used it.

The testimony of plaintiff Lebert White, Mid-American's chief spotter, agreed in most respects with Baker's testimony regarding what occurred. He testified that the crank handle had some "play" in it and that the tripper bar worked all right. He never noticed the chain attached to the truck and probably would have rejected the trailer had he seen it. He had never used a rope to shift bogeys and did not know if one was available. He was unable to explain what occurred. He did the same things with trailer 4011 that he had done with other trailers on numerous other occasions over his 15 year career as a spotter. Although he knew that being underneath a moving trailer was dangerous, he was unaware of any defect in the trailer. Had he been able to successfully shift the bogey, he would have returned the Interchange Agreement report to Mid-American's office.

Vince Bondi, the Chicago maintenance mechanic for White Owl, testified that White Owl did most of its major repair work at its facilities in Pontiac, Michigan, and that White Owl followed a regular schedule of preventative maintenance and relied on the reports of its drivers regarding other problems. Although the Strick trailers worked all right when they were new, the pins would occasionally stick. In such situations, the pins might be pounded with sledge hammers. As a general rule, he used a rope to pull the crank handle so that he would not have to get underneath the trailer. He stated that White Owl had installed the chain on trailer 4011.

Paul Tennenbaum, a mechanical engineer for Strick, testified that the

locking holes were ⅛ inch larger than the pins, that the crank handle was designed to move only 90°, and that each bogey position is checked before the trailer is delivered to customers. He was aware that the pins on Strick trailers could stick. No instructions were given to the users of such trailers regarding what to do if the pins stuck. Although he testified that the use of a sledge hammer is not the proper method of freeing pins which are stuck, pressure on the pins and the crank handle might be necessary to free the pins. Shaking the trailer might relieve the tension on the pins; but he saw no reason why anyone should remain under a trailer while it was being shifted.

Dr. M. F. Spotts, a retired professor of engineering, testified that although he was not experienced in the design of highway trailers, he did not believe Strick's design was good. Much of his testimony was excluded from evidence upon defendants' objections for lack of proper foundation and irrelevance and an offer of proof was made indicating that the design was defective because it required someone to go underneath the trailer to shift the bogey, because the track angles into which the locking holes were drilled were constructed of material which was too thin, because the track angles could become out of line, and because the locking holes could become out-of-round due to wear and tear. In his opinion, difficulties in shifting the bogey were inevitable.

Hayden Allen, formerly a White Owl mechanic employed at Pontiac, Michigan, testified that he was present when trailer 4011 first arrived. Within two months of the date of delivery, the pins began sticking. The president of White Owl was aware of this condition and had spoken to someone about it. Although the pictures do not adequately indicate the problem, the locking holes became elongated. A chain was installed to hold the crank handle open. Although the bogey slide was greased each time the trailer came to Pontiac, the grease had no effect. To his knowledge, the steam cleaner which was available at Pontiac was never used to clean underneath the trailers. When the pins of a Strick trailer stuck, he would do whatever was necessary to release the pins including pounding the pins or shaking the trailer. He did not use a rope in working on Strick trailers.

This testimony concluded plaintiff's case-in-chief. Defendants all moved for directed verdicts in their favor. The court entered directed verdicts in favor of Baker on Count I of the complaint and also in favor of Strick but only on Counts II and III of the complaint. It denied White Owl's motion for directed verdict.

Strick then presented its case. John Rabik, Strick's assembly line supervisor, testified that trailers like number 4011 had been made since 1945, that inspectors observe their manufacture throughout the process, and

that the trailers are checked before they are delivered to customers to insure that they operate correctly. If the pins stick the only remedy is to take the trailer box off the bogey and correct the problem. No alternative method of releasing the pins is available.

Roland Zuko, a design engineer and general manager of Strick, testified that the Strick trailer was designed as a one-man operation. Pounding on the pins could break the internal workings of the tripper mechanism. If the pin were removed from the tripper bar, the crank handle could not be moved. Wear on the locking holes would not necessarily affect the release of the pins. Replacement pins are available. If the pins get stuck, it would be necessary to jack up the trailer box or to apply external force to the trailer in addition to using the crank handle.

Burgess H. Jennings, a professor and associate dean of engineering at Northwestern University and the author of six text books, testified that in his opinion the location of the crank handle was proper and the track angles into which the locking holes were drilled were satisfactory. He stated that there was little chance of the track angles getting out of line. He observed that every hole in the photographs given him were essentially round and that if they were not round, removal of the pins would be easier.

At the conclusion of this evidence, both White Owl and Mid-American moved for directed verdicts in their favor in the third-party action. Upon hearing arguments of counsel and examining the interchange agreement, the court directed a verdict in favor of Mid-American and refused to direct a verdict in favor of White Owl. The court also denied White Owl's motion for directed verdict against White. The case was then submitted to the jury which returned a verdict in favor of White against White Owl and in favor of Strick against White.

OPINION

White Owl contends that the trial court erred in not directing a verdict in its favor against White in that White was guilty of contributory negligence as a matter of law. In support of its position White Owl relies on, among other cases, *Fore v. Vermeer Manufacturing Co.*, 7 Ill.App.3d 346, 287 N.E.2d 526, *Ferguson v. Lounsberry*, 58 Ill.App.2d 456, 207 N.E.2d 309, *Day v. Barber-Colman Co.*, 10 Ill.App.2d 494, 135 N.E.2d 231, and *Richardson v. Iowa Central Ry. Co.*, 179 Ill.App. 108. Plaintiff cites numerous cases and relies upon the principle that contributory negligence is generally a matter for the jury's consideration. Plaintiff points out that verdicts should be directed only when all the evidence, when viewed most favorably to the non-moving party, so overwhelmingly favors the movant that no contrary verdict could ever stand. *Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill.2d 494, 229 N.E.2d 504.

■■ While it is true that contributory negligence is generally a matter for the jury, it does not follow that it is always a question for the jury. Directed verdicts are not made inappropriate in all situations. We believe the instant case is one where a directed verdict was proper. Here, the evidence clearly indicates that plaintiff was an expert in spotting trailers. He was Mid-American's chief spotter and had considerable experience in the area of his specialty. Defendant points out that numerous alternatives were available to spotters in the performance of their duties. They could redistribute the load in the trailer as was commonly done with non-shifting trailers or they could reject the trailer. Also, if the trailer was of the shifting variety and the pins stuck as in the instant case, in addition to the above alternatives, spotters could use any of several methods to accomplish the shift of the trailer. They could hammer the pins. They could use the chain which was in plain view and installed for the purpose or they could use a rope when shaking the trailer. However, instead of adopting any of these safe methods, plaintiff, an expert in spotting, chose to get underneath the trailer while it was being shaken. Moreover, on the witness stand he admitted that he knew this was a dangerous practice. As a result of his being underneath the trailer, he was injured. In these circumstances, especially where questions exist regarding whether White Owl owes any duty to plaintiff and whether White Owl caused plaintiff's injury, we must conclude that the trial court erred in not directing a verdict in defendant's favor.

Since White Owl was not liable to White, we need not determine the merits of White Owl's contention against Mid-American regarding indemnification under the Interchange Agreement.

■■ Plaintiff White contends that the trial court erred in directing a verdict on Counts II and III of his amended complaint. Those counts, against Strick, alleged negligence and breach of warranty. The court permitted White's Count IV alleging strict liability against Strick to go to the jury and the jury found against plaintiff. Negligence, breach of warranty, and strict liability are alternative theories of relief. In the instant case, the trial court did not strike any of plaintiff's counts. It permitted plaintiff to present his evidence. However, upon hearing that evidence, the court determined that plaintiff's evidence was insufficient on the questions of breach of warranty and negligence to go to the jury. Plaintiff's evidence on the warranty count showed no warranties running to plaintiff, did not indicate the presence of any express warranties, and did not show that the trailer was unfit for hauling freight safely. Plaintiff's evidence of negligent manufacture and design depended upon the testimony of Dr. Spotts. Most of Spotts' testimony was excluded because plaintiff's prior witnesses had not established that the defects to which

he was referring actually existed. Thus, the trial court excluded parts of his testimony for lack of a proper foundation. We believe the court's ruling was proper.

Therefore, the order of the trial court denying White Owl's motions for directed verdict against White is reversed and the cause is remanded to enter judgment in favor of White Owl on such verdict. The order of the trial court directing a verdict in favor of Strick against White on Counts II and III and the judgment in favor of Strick on the jury's verdict on Count IV is affirmed. The judgment in favor of Mid-American in the indemnity action of White Owl is vacated.

Affirmed in part, reversed and remanded in part, judgment vacated in part.

DRUCKER and ENGLISH, JJ., concur.